HARDY *v.* HARDY.

4-6579 160 S. W. 2d 867

Opinion delivered March 9, 1942.

James H. Nobles, Jr., Graham Moore, C. T. Sims and J. R. Wilson, for appellant.

Lamar Williamson, Adrian Williamson and Griffin Smith, Jr., for appellee.

McHANEY, J. This is the second appeal of this case. The opinion in the former appeal may be found in the case of *Hardy* v. *Hardy,* 198 Ark. 1021, 132 S. W. 2d 365, where a full statement of the facts out of which this lawsuit grew is made. The decree of the trial court, dismissing the complaint because the plaintiffs had failed to comply with §§ 101 and 105 of Pope's Digest, requiring that claims against an estate be supported by affidavits verifying such claims, was reversed because, it was held, that the suit was not a demand against the estate of which appellees were the executors within the meaning of said sections and failure to comply therewith did not require a dismissal of the action. The cause was remanded to the chancery court to determine "whether R. L. Hardy had purchased property for the benefit of his wife with the funds of his nephew and niece (appellants) and, if so, to what extent." The last paragraph of the opinion of the former appeal, embodying the quoted language, next above, is as follows: "It was the view of the court below that §§ 105 and 101, Pope's Digest, had not been complied with, and that non-compliance therewith required the dismissal of the suit, and it was dismissed without any consideration or finding

as to whether R. L. Hardy had purchased property for the benefit of his wife with the funds of his nephew and niece and, if so, to what extent. It is our opinion that this question should be passed upon by the court below as it is one which would require the consideration of innumerable records. Upon the remand of the cause the court may be advised that the assistance of a master is necessary, or it may be desired to take additional testimony; but, even so, we think this question of fact should be determined by the court below in the first instance, and the decree will be reversed and the cause remanded for that purpose.''

This opinion was delivered October 23, 1939, and, in due course, the mandate of this court went to the court below, and on March 18, 1940, that court appointed Mr. Taylor Roberts of Little Rock, an able and reputable member of the bar of this court, as master to determine ''whether R. L. Hardy had purchased property for the benefit of his wife with the funds of his nephew and niece, and, if so to what extent.'' In appointing the master, the trial court instructed him as follows: ''You are instructed that R. L. Hardy has been adjudged a trustee of certain funds belonging to Ben A. Hardy, and Louise Hardy Graham, who are the plaintiffs herein. R. L. Hardy admits receiving the trust funds, the dissipation thereof and his inability to make restitution. Plaintiffs brought suit against R. L. Hardy to recover their money, in which suit the executors and heirs of Mrs. Ida Hardy, deceased, were joined as defendants upon the theory that some of the trust funds had been diverted to her estate. Shortly after institution of the suit R. L. Hardy was adjudged a bankrupt. Plaintiffs' hope of recovery is based upon the allegation that R. L. Hardy, while acting as their trustee, and as agent for his wife, Mrs. Ida Hardy, since deceased, invested some part of the trust fund in stocks, bonds and other securities which he wrongfully delivered to Mrs. Ida Hardy and which are included in an inventory of her estate, or the proceeds of which in changed form constitute a portion of her estate.

''It is your duty to ascertain from a careful examination of the books and accounts kept by R. L. Hardy, and

from the testimony and exhibits, whether or not any of the trust fund can be clearly traced and identified into the estate of Mrs. Ida Hardy, either in its original or substituted form.

"You are instructed that since a trustee cannot acquire an adverse right to trust funds for his own benefit, a third person who acquires it in violation of the trust, either as purchaser or otherwise, without giving valuable consideration therefor, or although giving valuable consideration, does so with actual or constructive notice of the trust, stands in the same position as the trustee, and the trust property, if it can be sufficiently identified, may be followed and impressed with the trust in his or her hands. And this rule applies into whosesoever hands the property may come unless it be found in possession of a *bona fide* purchaser for value without notice.

"You are instructed that neither the act of the trustee or his *cestuis que trustent,* without the consent of the other can change the relation of the parties so by mingling the funds with other funds change his character from that of trustee to that of a mere debtor.

"You are instructed that it is not necessary that Mrs. Ida Hardy be guilty of fraud in taking any profit of the trust fund or that she should have actually intended a violation of the trust obligation; it would be sufficient that she had in fact acquired property upon which a trust had been impressed, and that she is not a *bona fide* purchaser for value without notice.

"Under the foregoing instructions and the record before you, you will find whether or not the estate of Mrs. Ida Hardy should be charged with any of the trust funds alleged to have been diverted to her in her lifetime, and if so, the specific transaction and the amount."

The master entered upon his duties and on April 5, 1941, filed his report, which is in part as follows: "The defendant, R. L. Hardy, was appointed administrator of the estate of B. A. Hardy in 1907 and continued as such until the filing of his final report on which he was discharged in 1919. B. A. Hardy, prior to his death, was engaged in joint ventures with his brother, R. L. Hardy,

and in addition operated a mercantile business and, although it is apparent that he owed considerable amounts of money, his estate could have been liquidated over a reasonably short period of time for approximately $18,000 net worth, as is indicated by statements of the deceased to Y. R. Royal who apparently has no interest in the outcome of this litigation.

"During the progress of administration, however, covering the period of time above set out, the estate of B. A. Hardy was liquidated for an amount substantially in excess of this figure of $18,000. During the progress of administration, R. L. Hardy handled the affairs of the estate without order of the probate court practically as if a partnership existed between him and the estate, the only formalities indulged in being the annual reports filed as administrator.

"Mrs. Gertrude Hardy, the mother of the plaintiffs, Louise Hardy Graham and Benjamin A. Hardy, Jr., the only children of the deceased, qualified and was appointed guardian of their persons and property and continued as such until 1912 at which time R. L. Hardy was appointed guardian in succession and served as such until his final report on behalf of Louise Hardy Graham in 1922 at which time she attained her maturity, and for Benjamin A. Hardy, Jr., until 1927, at which times he took their respective receipts for the proceeds of their estates, however continuing to act as their special agents with respect to their properties until shortly prior to the institution of this suit. At the time of the execution of the receipts, no property was delivered to plaintiffs, his former wards.

"Mrs. Gertrude Hardy died in 1927. The relationship of principal and special agent had existed between her and R. L. Hardy from 1907 to the date of her death, covering the transactions reflected by the record in this case and by the books of R. L. Hardy which have been introduced in evidence.

"R. L. Hardy was engaged in the business of farming, farm and farm-operation financing, and a general real estate business in the pursuit of which enterprises

he had accumulated an estate which, prior to the year 1930, appears to have had a net worth of from $75,000 to $100,000, represented principally by notes, accounts, lands and mortgages. The record unquestionably discloses that he was a man of substance and prominence in the community in which he lived. The records of his operations were kept in a single-entry series of ledgers which are remarkably accurate and clear, and, as indicated by these records, his fixed business policy and operations did not change during the entire period in question.

"As stated above, the funds which came into the hands of R. L. Hardy as guardian of Louis Hardy Graham and Benjamin A. Hardy, Jr., from the liquidation of the estate of B. A. Hardy were invested, without orders of the probate court, in the character of operations conducted by R. L. Hardy, sometimes in specific properties and sometimes indistinguishably with investments of R. L. Hardy, and this applies to the funds of the estate of B. A. Hardy not distributed and to the funds of Gertrude Hardy. As collections were made from these ventures, the funds were reinvested and, as a result, there was never any considerable amount of cash on hand for the account of the estate, the agency or the guardianship, or R. L. Hardy personally. During the period of time from 1912 to 1934 substantially the greater portion of the investment of the guardianship funds is not identified other than by a note showing indebtedness of R. L. Hardy to his wards on which he charged himself with interest and, as pointed out above, the transactions were without order of the probate court, and, regardless of the motives or intentions, good or bad, underlying the situation, it amounted to a conversion of those funds. It is true, however, that a great portion of the admitted indebtedness of R. L. Hardy to Louise Hardy Graham and Benjamin A. Hardy, Jr., in the month of January, 1934, of $50,-783.75, constituted interest charges which R. L. Hardy had made against himself on these notes. This amount also included the balance credited to plaintiffs at the death of their mother, Mrs. Gertrude Hardy. From testimony introduced in the record by R. L. Hardy, coupled with the open entry on the books of this note transaction,

this practice of R. L. Hardy, in executing his note, thereby, as he thought, personally guaranteeing a return on the investment, was the result of an agreement with Mrs. Gertrude Hardy, mother of the minor children, arrived at to prevent their estate from becoming burdened with lands or property taken in·foreclosure or direct investments. Nevertheless, such an agreement would have no effect on the legal rights of the wards and would be binding only with respect to the matters transacted in the special agency existing between Mrs. Gertrude Hardy and the said R. L. Hardy.

"In 1893, R. L. Hardy was married to Miss Ida Harris, who, by inheritance from her father, was possessed of an estate of real and personal·property of a value of approximately $60,000. By agreement with her husband, she retained complete control of her separate estate, even to the point of paying all of her personal expenses and sharing in the payment of household expenses with the exception of grocery bills. Over a period of time from the date of her marriage to the date of her death in 1934, R. L. Hardy acted as her special agent in the collection of some of the rents from her properties and some of the notes, interest, dividends and other things and amounts which might be due her. The proceeds therefrom, likewise, in many, but by no means all instances, were reinvested for her by him in various things such as personal loans, certificates of bank deposits, stocks and bonds, with certificates of deposit, stocks and bonds vastly predominating. A record of such transactions was kept in the aforesaid books in the account with her which also contained the charges made against her for her personal expenses and the portion of the family expense above set out. Under this agreement, she required monthly reports and a charge was made for the service of R. L. Hardy in attending to these affairs and keeping a record of such of her transactions as came through his hands. This book account also apparently served as a memorandum record of services performed for Mrs. Hardy where no actual funds involved in the transactions passed through his hands, or at least through his bank account hereinafter discussed, such as

attending to the cashing of a certificate of deposit and the purchase of liberty bonds. Great numbers of the collections made by R. L. Hardy for his wife, however, were deposited by him in his personal bank account and thereafter withdrawn by his check to cover purchases or investments made by him for her or expenditures for her personal account and expenses under the arrangement above set out, appropriate entries being made on the book account; in other words, some of the payments for expenses and investments and deposits in the personal bank account of Ida Hardy being handled as cash items and others through the bank account of R. L. Hardy.

"R. L. Hardy carried his personal bank account, and apparently the only account used in the conduct of his business, with Commercial Loan & Trust Company of Monticello, Arkansas. During a part of the period in question, that is, from 1912 to 1934, as reflected by the testimony of Mr. J. V. Stewart, a certified public accountant who has examined the books and accounts of R. L. Hardy, $1,200,000 passed through this account. The daily balance, however, indicates that, at numerous times, credit ranged from less than $100 to an overdraft. The record unquestionably established that R. L. Hardy borrowed from the banks on open notes large sums of money for his operations, and that the credit was justified by the success of his operations and his accumulated assets.

"Mrs. Ida (Harris) Hardy was a sister of Doctor A. E. Harris, Judge Marvin Harris, later of Little Rock, Arkansas, Joseph S. Harris and Ruth Harris. R. L. Hardy was guardian for Joe S. Harris until he reached his majority in 1908 at which time he made final settlement with him on the basis of approximately $70,000, taking his receipt therefor and continuing to handle his estate for him until about the year 1912 when final settlement was made. He likewise handled the estates of A. E. Harris, Judge Marvin Harris and other persons in the family relationship under the same method and manner of the estate and guardianship under consideration. Mrs. Ida Hardy shared equally with her brothers and sisters in the distribution of her father's estate.

"The plaintiffs contend that the amounts due them by reason of the guardianship account, from the estate of B. A. Hardy and by inheritance from their mother, Mrs. Gertrude Hardy, have been diverted by R. L. Hardy to the estate of Mrs. Ida Hardy, and seek to trace those diverted funds into that estate and, to the extent of the diversion, charge it with the diversion. . . .

"The consideration of three general situations is necessary for a correct determination of the cause under the foregoing instructions. The first deals with the items charged to the account of Mrs. Hardy for the purchase of stocks, bonds, properties, certificates of deposit in banks and open deposits made for her account by checks drawn on the personal account of R. L. Hardy in the Commercial Loan & Trust Company which fund plaintiffs maintain constitutes a trust fund and is listed in Exhibit 'A' to the deposition of Benjamin A. Hardy (Tr. 649) and Exhibit 'A-1' to the deposition of E. R. Cotham, a certified public accountant testifying for the plaintiffs.

"Second, the determination of the proper allocation of the sum of $37,341.02 representing various items purporting to be collections for the account of Mrs. Ida Hardy by R. L. Hardy and which do not appear on the books of R. L. Hardy prior to the alleged credit and which are set out in Exhibit 'B' of the deposition of Benjamin A. Hardy.

"Third, the transfer of United States Liberty Bonds of the total face value of $1,150 from the estates of B. A. Hardy and Benjamin A. and Louise Hardy to Mrs. Ida Hardy.

"The remaining issues raised by the pleadings and reflected by the depositions are inter-related so that they can be disposed of in the determination of the foregoing issues. From the research conducted, the master reaches the following conclusions and makes the following findings: 'It is established by the evidence that all expenditures made by R. L. Hardy for the benefit of his wife, as reflected by Exhibit 'A' to the deposition of Benjamin A. Hardy and Exhibit 'A-1' to the deposition of E. R.

Cotham, were from the proceeds of funds or collections in and on that account coming into the hands of R. L. Hardy for the benefit of his wife. It is further established that the expenditures were made in most instances immediately succeeding or preceding collections by R. L. Hardy for her account in amounts sufficient to cover the expenditure for her. At any rate, so far as the books reflect, the charges to her account throughout the entire period have been balanced by credits as the result of collections and payments due her. Benjamin A. Hardy (Tr. 631), testified that he had examined the books 'available,' and presumably they are the same records furnished the master, from 1907 through 1933, and that he found no instance where balance on the account at the end of the year was erroneous. Mr. J. V. Stewart's testimony was to a like effect, with the exception that, taking into consideration amounts reflected by the books as a note indebtedness of R. L. Hardy to Mrs. Ida Hardy, the account at all times showed a credit in her favor excepting (Tr. 1139) a period from May 8, 1920, to September 7, 1920, during which she was indebted in amounts of balances ranging from $1,700 to about $350 which account, after September 7, 1920, resumed its normal status of showing a credit in favor of Mrs. Ida Hardy.

"The plaintiffs have selected an erroneous premise to the effect that the personal bank account of R. L. Hardy with Commercial Loan & Trust Company constituted a trust or a trust fund made so by the unauthorized appropriation by R. L. Hardy of the funds belonging to plaintiffs and those through whom they claim, some portion of which at various times passed through this personal bank account. Certainly there is no evidence upon which to base even a conjecture that the amount represented by the notes given by R. L. Hardy, as guardian, administrator or agent, represented a deposit of that amount in the bank account, but, quite to the contrary, it is clear that the notes represented a portion of the investments made by R. L. Hardy in things other than the bank account. There is no substantial evidence, and apparently no effort has been made to definitely trace the balances remaining as credits, as shown by the books, over and

above the notes referred to in these individual accounts, to specific deposits in the bank and identify them with the purchases of securities for Mrs. Ida Hardy. Generally, there is no showing made that these balances, in some instances styled "Cash on hand," ever became a part of the bank account of R. L. Hardy and they were usually absorbed at the end of the fiscal year by inclusion in the renewal note of R. L. Hardy to the estates."

"Mr. J. V. Stewart (Tr. 1206-1207), in answer to a question of counsel for the defendants, said:

"'Q. Well, from your study of the ledgers there, which I believe you testified showed that he only had one bank account in which he placed the money of all these people, wouldn't that entry on his ledger there transfer that money that was already in the bank account to credit, so far as these books are concerned, to these particular individuals; and if the money was not in the bank but in his safe, wouldn't it have the same effect as being a cash transfer? A. Not as I see it, no, sir. I can't see it that merely a book entry would have the effect of transferring any cash in the bank to any specific account. The book entries would reflect to me that he owed them that much money. Q. Let me ask this question so that I will be sure you understand it. If Mr. Hardy did have a sum of money placed in the bank belonging to these people, then how could he tell what part of that money belonged to each one, based on his ledgers? A. I don't think he could tell; and as I see his ledger accounts they merely show what he owed each of these parties at various times. . . . Q. Then, according to your testimony, when money was placed in the common fund by Hardy, so far as these particular individuals are concerned, it immediately lost its identity? A. To me it lost its identity; any moneys which he collected or showed collected through these books lost its identity before it got to the bank, for the reason that, as I have stated many times before, I have been unable to positively identify any of the money as the deposit having been made in the bank.'

"The conversion of plaintiff's funds and of the funds to which they succeeded by inheritance, whether said con-

version was innocent or tainted with fraud, and we think innocent, was by R. L. Hardy and not the bank account. That act of his did not so permeate his general estate that it would be contagious to all persons thereafter dealing with him.

"Not having been able from investigation of the books and records themselves to trace funds of the plaintiffs into the bank account, I have not been able to trace and identify them in the estate of Mrs. Ida Hardy either in original or substituted form covering such payments as were made from the bank account of any items listed in the said Exhibit 'A' to the deposition of Benjamin A. Hardy and Exhibit 'A-1' to the deposition of E. R. Cotham. So far as the record shows, and the books reflect, the funds converted lost their identity in the general assets of R. L. Hardy, and the bank account no more constituted the trust itself than the safe in his office or the pockets in his clothing.

"The converted funds, as above stated, apparently went into investments. These investments may or may not have been liquidated. Apparently a major portion of them, however, were liquidated and the proceeds therefrom passed back through the bank account, but prior to that time there had been such a mingling in the general stream that no portion of the plaintiffs' funds could be identified at the time it flowed through the bank. As Mr. E. R. Cotham testified (Tr. 417), in comparing the method of keeping the accounts of Mrs. Ida Hardy and plaintiffs, after eliminating the items of personal expenses.

" 'I don't believe there would be any difference in the method of handling the accounts; but of course there would be this difference, in that Mrs. Ida Hardy's funds were apparently invested in various things, whereas from the records the majority of the funds of Louise Hardy, Benjamin Hardy and Mrs. Gertrude Hardy were borrowed by Mr. R. L. Hardy, personally. It could be—and if they were personally borrowed by him, there could be no further investment of these funds, because the funds weren't available, because they had already been loaned to himself.'

"The major portion of the testimony of E. R. Cotham and Mr. J. V. Stewart was directed in an effort to identify withdrawals from the bank account of R. L. Hardy to cover the specific charge appearing in the books against the account of Mrs. Ida Hardy apparently under the theory above mentioned, that identification of a check for the amount would automatically fix a liability against the estate of Mrs. Ida Hardy. Their action is not one for a general accounting against Mrs. Hardy, but one that can be maintained only by following their misappropriated funds into her estate. Consequently, proof that specific funds of the plaintiffs were on deposit and that those funds were used to pay the check issued has not been made.

"Examination reveals that in some instances credits appeared on the books to the accounts of the plaintiffs and that at or near the date thereof the bank account showed a deposit sufficiently large to have included the item, and also that if the credit item, and the deposit does not show, was included, there was no time that any check drawn for the benefit of Mrs. Hardy at or near the time could not have been paid from the balance of his account after deducting the credit item.

"The cardinal fact disclosed by the record, that the misappropriation of the funds, that is, the 'borrowing' by R. L. Hardy, was done innocently and without intent to deprive plaintiffs of their property, accounts for the inability to trace those funds into the estate of Mrs. Hardy. As pointed out in the court's directions quoted *supra,* this would not affect his legal liability, nevertheless he was not converting for his own benefit and certainly not under a scheme to build up an estate in the hands of his wife, and the argument of counsel or plaintiffs to this effect is entirely unsupported by the record.

"During the period of these transactions this country experienced its greatest wave of prosperity. Both R. L. Hardy and Mrs. Ida Hardy unquestionably had large and solvent estates during all of the period involved and it is unreasonable to suppose that R. L. Hardy chanced jeopardizing his personal estate in order to divert the estate of plaintiffs to his wife, which estates of plaintiffs in a

large part, consisted of interest accumulated on R. L. Hardy's 'borrowings.'. Mrs. Hardy's separate estate was amply capable of financing these purchases and expenditures for her account and so was that of R. L. Hardy, without resorting to funds of plaintiffs. The fact that R. L. Hardy later wound up in bankruptcy cannot be attributed to unsound and speculative business ventures because, as stated in the first part of this report, they were the same ventures he had engaged in during his entire business career. The court will probably take judicial notice of the fact that the era of large scale farm furnishing business closed shortly after 1930 and that many other persons found themselves in the same predicament as R. L. Hardy.

"Mrs. Hardy, by collections due her, paid all items which were charged against her on this account. She had no actual knowledge, so far as the record reflects, of the manner of R. L. Hardy's handling of the trust estate. I, therefore, find that the plaintiffs are not entitled to charge the properties in the estate of Mrs. Ida Hardy with these expenditures reflected by said exhibits.

"Items Set Out in Exhibit 'B' to Deposition of
Benjamin Hardy

"The account of Mrs. Ida Hardy, on the books of her husband, over the period of time in question reflected credits in the amount of $37,341.02, covering 41 sources, purporting to represent collections for her account from John H. Anderson and others. The books or R. L. Hardy did not reflect that John H. Anderson and others owed Mrs. Hardy, neither was there any account of John H. Anderson and others carried as due R. L. Hardy. In other words, the books carried no evidence of and made no reference to these persons. The items, therefore, represented fictitious credits to balance the account of Mrs. Hardy, or amounts due R. L. Hardy and not entered on his books and fraudulently transferred to her account for credit, such as is frequently found in cases of concealing assets, or they were amounts due Mrs. Hardy in her individual operations, in which latter event there would be no necessity for their appearance on the books of R. L. Hardy. The evidence establishes beyond any

reasonable doubt that these credits were amounts due Mrs. Hardy individually and had no connection with the business of her husband or the agency existing between her and him except to the extent that he collected these items for her in just the same manner as he collected rents on some of her real property which real property of course was not set up as a counterbalancing debit on his books. The claim is entirely without merit, unsupported in fact and not chargeable in law against the estate of Mrs. Ida Hardy, and certainly bears no relation to the question of tracing assets of the plaintiffs into her present estate. This is so apparent, and the proof so certain, that the items could have been advanced only for the purpose of attempting to discredit the book records. The testimony of R. L. Hardy (Tr. 1525, *et seq.;* exhibits, James A. Ross, Tr. 2070; exhibits, R. L. Hardy, Tr. 2590), together with supporting records, clearly establishes the correctness of these credits, but if it were not so, an arbitrary assumption that the credits were fictitious would not meet the burden of proof required of the plaintiffs. Certainly it would have been a simple matter to have shown, since all of the persons named on the schedules were residents of the community, by subpoenaing them as witnesses, that they were indebted to R. L. Hardy instead of Mrs. Ida Hardy, or that they were indebted to neither. If they were fictitious persons, this likewise could have been demonstrated and there is no effort directed along either course. I, therefore, find that no portion of the amount represented by the exhibit constitutes funds of the plaintiffs diverted to her account and chargeable against any of the assets therein.

"Transfer of United States Liberty Bonds from
Estates of B. A. Hardy, Benjamin A. Hardy,
and Louise Hardy.

"R. L. Hardy held as administrator of the estate of B. A. Hardy a liberty bond or bonds in the amount of $150 which had been acquired for that estate at some time previous to April 15, 1920, as reflected by prior entries on the books crediting the estate with the collection of interest on liberty bonds. On April 15, 1920, Mrs. Ida Hardy was charged with the purchase of liberty

bonds and the estate of B. A. Hardy was credited with the sale. It is practically undisputed that a bond or bonds in this amount held in trust by R. L. Hardy was transferred to Mrs. Hardy's estate. The bond is not identified on the books by a serial number and I am unable to determine its identity by serial number from the records. R. L. Hardy testifies that this bond and each of these hereinafter discussed were actually delivered to Mrs. Ida Hardy, indicating that he did not take the bond and deposit it in her safety deposit box at the bank which, however, apparently is of no consequence.

"On April 15, 1920, at the time of this transaction, which has been described as a mere journal entry on one hand and actual delivery on the other, the books of account between R. L. Hardy and his wife show that he was indebted to her exclusive of any note account in the sum of $526.72 at the close of the day and in the sum of $326.15 at the end of the month, for amounts coming into his hands as her special agent and for which he was required to account to her.

"On May 8, 1920, R. L. Hardy had in his possession two liberty bonds for the sum of $50 each or one bond in the sum of $100, which he held as trustee for Benjamin A. Hardy and his sister, Louise Hardy. This bond, or bonds, in the same manner and under the same circumstances was transferred to Mrs. Ida Hardy. The record likewise does not show any serial number identification. On May 8, 1920, the date of this transaction, the aforesaid book account indicated that Mrs. Hardy was indebted to her husband in the sum of $1,523.50. This situation continued until September 7 of that year, during which time collections were made, credited and retained by R. L. Hardy to cover this charge for bonds against her and her other items of indebtedness. At the end of the year the account reflects that R. L. Hardy had again become indebted to her in the amount of $369.38.

"On October 16, 1922, R. L. Hardy had in his possession a liberty bond in the principal amount of $450 belonging to Louise Hardy, which said bond in the manner described above was transferred to Mrs. Ida Hardy. On

that date the account shows that there was a balance due in favor of Mrs. Hardy in the sum of $491.26, after charging her with the bond, and at the end of the month a credit balance of $485.73.

"On March 29, 1932, R. L. Hardy likewise had in his possession $450, face value of liberty bonds held for Benjamin A. Hardy, which were likewise transferred to Mrs. Ida Hardy and at which time the said book account indicated a balance in favor of Mrs. Hardy of $353.97 at the end of the day, there being no further charges of credits on her account for the month after that time.

"These bond transactions are the only instances, in accordance with the directions of the court, where the master has been able to identify and clearly trace specific properties of the plaintiffs or persons or estates through whom they claim into the hands or estate of Mrs. Ida Hardy. There is some testimony in the record that bonds of this character at that time did not have a market value of par, but it is a matter of which the courts would take judicial notice that if the bonds were retained to maturity they were paid in full, and therefore it is taken that they were worth par at the time of the transfer to Mrs. Hardy. There is no testimony in the record that Mrs. Hardy ever disposed of any of her government bonds, whether of the liberty issue or subsequent issues, many of which were converted to the new issue at the time of the call, and while, as stated above, all of the above mentioned bonds are incapable of identification by serial number and are still incapable of identification in the United States government bonds now held by the executors, yet it is a reasonable conclusion that they exist in substituted form in the present United States government bonds held by those executors.

"All the bonds in question so transferred from the estates of B. A. Hardy, Benjamin A. Hardy and Louise Hardy appear to have been unregistered, so that title passed on delivery and there is no evidence to charge Mrs. Ida Hardy with actual knowledge of the rights of the plaintiffs in the bonds. Whether or not she had constructive knowledge by reason of the agency existing

between her and R. L. Hardy, or whether or not the transfer in satisfaction of an existing indebtedness constituted a purchase for value, are both questions of law on which the master presumes that the court under the instructions aforesaid, reserves for its decision.

"I find no connection between the estate of Mrs. Ida Hardy and the item of $6,419.42 referred to in Exhibit 'D' to the deposition of Benjamin A. Hardy as having been dropped from her account. If the amount had arbitrarily been deducted from her credit balance, still it is not identifiable with the assets in the hands of the executors. Nevertheless, the defendants seemingly accepted the burden of proof which was not on them and clearly established that this item was not dropped as charged (see testimony of J. V. Stewart, Tr. 1193; R. L. Hardy, Tr. 952, *et seq.*). Other extraneous matter, such as the delivery of the liberty bond indorsed in blank by R. L. Hardy to the executors for listing among the assets of the estate; Eric Hardy's interest in the filling station; assignment of executors' fees to R. L. Hardy, etc., was injected into the record, but so far as I am able to determine in accordance with the instructions given me, I find no connection between these matters, most of which were litigated in other actions and the estate of Mrs. Ida Hardy."

To this report appellants filed very lengthy objections and exceptions, and on July 2, 1941, the court entered a decree adopting "all findings of said master as the findings of this court, and doth find all issues of fact and law in favor of the defendants, R. L. Hardy and Union Bank & Trust Company, as executors of the estate of Mrs. Ida Hardy, deceased." The complaint was dismissed "for complete failure to prove the allegations of their complaint, and for want of equity." Costs were adjudged to be divided equally between the parties. From this decree is this appeal. Appellees have cross-appealed as to the costs.

It appears to be undisputed that, at the time of B. A. Hardy's death in 1907, his business affairs were considerably involved. His assets consisted of numerous

notes and accounts against customers of his former mercantile business which he had recently discontinued previous to his death and his equity in lands which he, R. L. Hardy, and another had purchased on credit. R. L. Hardy had indorsed his brother's notes to banks in Monticello amounting to some $30,000 or $40,000 and it was shown that B. A. Hardy did not have on hand in cash a sum sufficient to pay his burial expenses. But by good management of his brother's estate as administrator thereof, no fees as such being charged by him, he succeeded in paying debts and costs of administration in the sum of $53,004.53, as shown by his first settlement, between 1907 and 1919 and disbursed to B. A. Hardy's widow, Mrs. Gertrude Hardy, she being the guardian of appellants, either in her individual capacity or as guardian, the sum of $23,110.41. In addition to this, after completing his administration, he conveyed to appellants 1,941.57 acres of land which he stated as a witness were worth $15,850.77. Mr. J. V. Stewart, an expert accountant, stated that R. L. Hardy's books show that he charged himself and credited the B. A. Hardy family with interest at 8 per cent. per annum on all funds of theirs which he was handling for them through 1928, and thereafter at 6 per cent. He summarized R. L. Hardy's transactions, as shown by his records, as follows: ''The analysis of the four accounts involved, B. A. Hardy estate, Benjamin A. Hardy, Louise Hardy Graham and Mrs. Gertrude Hardy, shows that from February 1, 1912, to December 31, 1933, Mr. R. L. Hardy received cash for them $100,812.21, paid out for them $87,732.64, leaving a net balance in the analysis of the cash, $13,079.57 as owing to them; a note of $3,900 which his records show was turned over to them by Mrs. Gertrude Hardy at the time she relinquished the guardianship; interest credits of $44,096.31 on the accounts, guardian's fees and service charges charged to the account $11,240.03, and a land settlement total $1,302.62 plus a beginning balance in his hands owing to the B. A. Hardy estate on February 1, 1912, of $1,023.66, plus a credit balance in the account of Mrs. Gertrude Hardy on February 1, 1912, of $1,343.46; leaving a balance due these two heirs of B. A.

Hardy at the close of that period of $50,837.35, which includes all the indebtedness that R. L. Hardy's books show he owed them at that time.''

From 1907 to 1934, R. L. Hardy charged himself on his books and credited the appellants or their mother with interest amounting to $44,096.31. During the same period, he charged for his services $11,240.03, or a net interest charge of $32,856.28, which latter amount is included in his admitted indebtedness to appellants. From 1907 to December 31, 1912, the mother of appellants was their guardian, during which time she loaned funds belonging to her and to her wards to R. L. Hardy on his unsecured notes, and Mr. Stewart testified that his ''books show very clearly that he owed practically all of this money in the form of notes. They never at any point showed that he had any large amount of cash on hand belonging to the plaintiffs.'' After he became the guardian of appellants in 1913, he continued the same practice started by their mother and not only without objection by her, but with her full knowledge and consent, and with their knowledge and consent both before and after their majority. It is doubtful if any of their money ever went into his bank account, but if so he borrowed it, charged himself with it and paid them interest on it at the rates aforesaid. His final settlement as guardian of B. A. Hardy made in 1927 shows that over the whole period he had collected in cash for said ward $7,936.09 and had paid out to him or for his account $13,702.57, or $5,766.48 more disbursed in cash than he had received. As to Louise his final settlement made in 1922 shows that over the whole period, he had received for her account in cash $9,379.94 and had paid out to or for her account, in cash, $17,388.25, or $8,008.31 more disbursed in cash than he had received. Each ward gave Mr. Hardy a receipt in full at the time the final settlements were made in the probate court, that of Benjamin was for $17,032.44 and that of Louise was for $11,784.97, and these final settlements were each approved by the probate court and he was discharged as such guardian. It is undisputed that they were not paid these sums when they gave these receipts, but they must have known that he was using

their money in his own business. Their mother, in her lifetime, so knew and had requested that the funds be handled in this manner, instead of investing in bonds paying low rates of interest, or in real estate mortgages which might result in acquisition of the land by failure to pay and foreclosure, and we think it a reasonable inference that they knew how their funds were being handled, at least long before this suit was brought, and that they not only made no objection, but ratified it.

Appellants have much to say about the bank account of R. L. Hardy with the Commercial Loan & Trust Company of Monticello, the so-called "Common Trust Fund" and base their case upon the proposition, that, from 1907 to 1934, inclusive, he kept an account with his wife, with the B. A. Hardy estate, Mrs. Gertrude Hardy, and with each of appellants, and that all moneys which he actually handled, collected or disbursed, for the account of either of these parties, were deposited in and checked out of his personal bank account in said bank, and that their funds so deposited were diverted by him to purchase securities or to make investments for his wife, Mrs. Ida Hardy. We agree with the master and the trial court that there is no evidence to substantiate the claim. The claim is based on the fact that, in some instances, his account with Mrs. Ida Hardy shows an overdraft due him by her, but in a large majority of the instances selected and relied on by appellants, where her account shows amounts charged to her as an investment or otherwise, the same record nearly always shows a corresponding amount, and generally the identical amount, collected by him for her account on the same day, or shortly thereafter. In rare instances in which this is not the case, the account shows he is indebted to her, or his separate note account shows he owes her on a note, or the account shows collections for her account which reimbursed him in a short time after the disbursement made for her. Mr. Stewart testified: "The books (of R. L. Hardy) do show that through the entire period of February 1, 1912, to the close of the year 1933, Mrs. Ida Hardy did not withdraw or there was not paid out for her benefit any more than was collected for her or went through the account for her credit. As a matter

of fact, during this entire period of time, the books show that there was more money coming into the hands of R. L. Hardy for the credit of Mrs. Ida L. Hardy than was expended for her, or by him for her, through these bonds." He further testified: "The books show that as a general rule the funds belonging to Mrs. Ida L. Hardy were not in Mr. R. L. Hardy's hands for any great length of time. Her account shows that funds have come in and in many instances on the same day funds would be withdrawn; in some instances for exactly the same amount; in other instances funds near the same amount; with at times her account showing a credit balance of several thousand dollars for a short period of time." . . . "Q. As shown by those books, did Mrs. Ida Hardy at any time receive from Mr. R. L. Hardy money or funds invested by him for her account which were not due and owing to her by Mr. Hardy? A. No, sir."

Appellants apparently disregard the fact that during most of this period of years, Mr. R. L. Hardy was depositing and withdrawing from this same bank account funds in large sums he was handling for three of Mrs. Ida Hardy's brothers, Joe S. Harris, aggregating $128,-588.70; A. E. Harris of $72,726.51; and Judge Marvin E. Harris of $66,040.09. Also the funds of Mrs. Naomi Stewart, Mrs. C. A. Lambert and Mrs. Nora Hardy Penniston in substantial amounts for each. In addition his own personal funds, over the same period, running into hundreds of thousands of dollars, went through this bank account. Mr. Stewart said: "Approximately $835,000 went through the bank account during that period which the records do not show as having been received through the accounts of Mrs. Ida Hardy, B. A. Hardy estate, Benjamin A. Hardy or Louise Hardy Graham." He said, "R. L. Hardy's books show that there was approximately $1,200,000 deposited in the bank account from October, 1912, through the year 1933." Only about $100,000 of this amount was connected with the estate of B. A. Hardy, his widow or with appellants, and only about $265,000, including turnover or repetitions of collections and disbursements, was connected with Mrs. Ida L. Hardy, assuming that all collections and payments or

investments made for her, as shown by his books, passed through the bank account. If Mr. Hardy did divert any of the funds of appellants, and we do not find that he did, there is no more reason to assume or to presume that he diverted them to his wife than there is that he diverted them to pay banks, from whom he borrowed large sums of money, on his own account, or to his brothers-in-law, the Harrises.

Another matter relied on by appellants is the sale of $1,150 of liberty bonds held by R. L. Hardy for appellants to his wife. On April 15, 1920, one $150 bond, alleged to have been held for the B. A. Hardy estate, was sold to Mrs. Ida Hardy for $240; May 8, 1920, two $50 bonds, alleged to have been held for appellants, were sold to her; October 16, 1922, one $450 bond, alleged to have been held for Louise, was sold to Mrs. Hardy for $459.59; and March 29, 1923, one $450 bond, alleged to have been held for Benjamin, was sold to her for $459.54. It is undisputed that these bonds were not only sold by R. L. Hardy to his wife for their full market value but were actually delivered to her by him, and that appellants received credit for same in their accounts and were actually thereafter paid in cash sums largely in excess of the amount of these sales. Louise was paid according to Stewart, after March 29, 1923, $4,195.47 plus $1,423.64 for other expenses, and Benjamin was paid after the same date $2,614.45 and other expenses of $2,582.72, so they have received much more than the cash consideration of the sale of these bonds.

Appellants also assert, with much insistence, that the great increase in the estate of Mrs. Ida Hardy during the years is indicative of their contention that a portion of their funds were used by R. L. Hardy to augment his wife's estate. A brief review of her estate may be here appropriate.

She was the daughter of A. E. Harris who died in 1892 in Drew county, and was one of five heirs, and her portion of the estate, in both real and personal property, amounted to about $63,000. She later inherited from her mother and an uncle about $1,500, or a total of about

$64,500, the greater portion of which was in her hands by 1895. She died leaving an estate of a net value of about $86,500. She was a very good business woman, made many investments on her own account and her husband made many for her. He kept an account of all her business in his books, not only of the collections and disbursements that he made, but also of what she made. She required him to make monthly reports to her and an annual inventory showing the condition of her account. Testifying from original memoranda made in the preparation of joint income tax returns for 1918 through 1933, he showed that her average income for each of the 13 years was $5,825.58, or a total for said years of $75,-732.58. Eric Hardy testified to an estimate of his mother's gross income from 1893 to 1934, based in part on estimate and in part on the actual income tax data, and found it to have been $157,707.58. We, therefore, conclude that there is no foundation for the assumption that her estate was in any manner augmented by a diversion of appellants' funds.

Other matters are discussed by the parties and many cases are cited and rules of law quoted and relied on, but we think it unnecessary to discuss them. This case was reversed and remanded on the former appeal to determine a simple question of fact, "whether R. L. Hardy had purchased property for the benefit of his wife with the funds of his nephew and niece and, if so, to what extent." We agree with the master and the trial court that it has not been shown that he did this, and the judgment on the direct appeal is affirmed.

The cross-appeal is from the order of the court adjudging that appellees should pay one-half the costs. In view of the fact that the first appeal was reversed at the cost of appellees, we think the court was correct in adjudging that each party pay one-half the costs, and the decree will, therefore, be affirmed on the cross-appeal.